FILED
Mar 15, 2019
03:10 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Louis Wilson | ) | Docket No. 2018-02-0115 |
| | ) | |
| v. | ) | State File No. 12598-2018 |
| | ) | |
| O.G. Kelley and Company, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Brian K. Addington, Judge | ) | |

---

**Affirmed and Remanded – Filed March 15, 2019**

---

In this interlocutory appeal, the employee alleges he suffers from various medical conditions caused by repeated exposure to lead at work. The employer declined to authorize medical treatment or pay temporary disability benefits, asserting: (1) the employee failed to give proper notice of an occupational disease; and (2) there is insufficient evidence that any of his conditions are causally related to occupational lead exposure. Following an expedited hearing, the trial court concluded the employee is likely to prevail at trial in proving he gave sufficient notice of his alleged occupational disease and in establishing medical causation. It ordered the employer to provide the employee a panel of specialist physicians, but it denied the employee's request for temporary disability benefits. The employer has appealed. We affirm the trial court's order and remand the case.

Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge David F. Hensley joined.

Joseph Ballard, Atlanta, Georgia, for the employer-appellant, O.G. Kelley and Company

Dan Bieger, Bristol, Tennessee, for the employee-appellee, Louis Wilson

**Factual and Procedural Background**

Louis Wilson, Jr. ("Employee"), a resident of Washington County, Tennessee, worked for more than twenty years as a machinist at O.G. Kelley and Company ("Employer"), a manufacturer of radiation shielding and miscellaneous specialty products. Employee alleges that over the course of his employment, he was repeatedly

1

exposed to lead, which he believes caused various medical conditions. Employee testified he spoke to the owner of the company, James Bready, in June 2017 about these issues. His last day of work was July 7, 2017.

Medical records entered into evidence indicate Employee's medical providers were concerned about his lead exposure as early as 2005. In a December 2005 report, Dr. Richard Rolen noted Employee's description of lead exposure both at home and work. Dr. Rolen commented that Employee's possible anemia "can be a sign of lead poisoning." A December 21, 2005 lab report indicated an abnormal level of lead in Employee's blood. Due to this test result, Dr. Rolen referred Employee to Dr. Ray Lamb, a hematologist.

In his February 1, 2006 report, Dr. Lamb noted Employee's description of his work involving the burning of lead and lead dust. However, Dr. Lamb's objective testing did not show evidence of red blood cell damage compatible with lead poisoning. He prescribed medication and asked Employee to return several weeks later. In his follow-up report dated February 23, 2006, Dr. Lamb explained that a lead level of less than 20 would be in the "normal range" and a level greater than 40 would merit further treatment. As of that date, Employee's lead level was 42. On March 10, 2006, Dr. Lamb diagnosed lead toxicity and prescribed a treatment known as chelation therapy in an effort to reduce lead levels.[1] There are no additional medical reports in the record for the following ten years.

In November 2016, Employee was seen by Dr. Raymond Merrick, a cardiologist. Employee complained of fatigue, weakness, extremity pain, difficulty focusing, and memory problems. He also described his history of lead exposure. Dr. Merrick noted a lead level of 27.5, but was unsure whether it was "a chronic level or an increase." Dr. Merrick concluded Employee had "lead exposure" and referred him for a hematology/oncology evaluation.

Employee was evaluated by a hematologist, Dr. Charles Famoyin, in June 2017. At that time, Dr. Famoyin noted Employee's history of "occupational exposure to lead, with possible toxicity." Employee's lead level was 37.7. He complained of swelling in the hands and feet, tingling and numbness in his extremities, and chest pain. Dr. Famoyin's assessment included "elevated lead level, which is occupational related." However, he also stated, "I do not believe all his symptoms are due to [the] lead toxicity issue alone." He recommended chelation therapy if Employee's lead level was higher than 40, but medical monitoring otherwise.

---

[1] Chelation therapy uses medication in an attempt to remove metals from the patient's body. "What is Chelation Therapy?" https://www.webmd.com/balance/guide/what-is-chelation-therapy#1 (last visited March 14, 2019).

2

Employee returned to Dr. Merrick in December 2017, at which time Dr. Merrick noted "a long history of environmental lead exposure through his work." Employee complained of fatigue, weakness, depression, and difficulty with concentration and memory. In his summary, Dr. Merrick commented, "[i]n my opinion he is dealing with the effects of chronic lead toxicity." This conclusion was echoed by Dr. Famoyin in January 2018, when he stated Employee suffered from the "toxic effect of unspecified metal, . . . [w]ith elevated lead level, which is occupational related." He reiterated this opinion in February 2018 and discussed the possibility of more chelation therapy.

In February 2018, Dr. Merrick responded to an inquiry from Employee's counsel, noting Employee suffered from hypertension, depression, chronic lead exposure, neuropathy, and fatigue. Dr. Merrick indicated Employee's work with Employer contributed more than 50% in causing these conditions. He also opined these conditions rendered Employee permanently and totally disabled. Employee filed his petition for benefits on February 20, 2018.

In its pre-hearing brief, Employer argued Dr. Merrick, a cardiologist, was not qualified to offer an opinion as to the cause of Employee's medical conditions and/or lead toxicity. It also noted that the hematology expert did not believe all of Employee's medical conditions were causally related to lead exposure but did not specify which conditions he believed were related. Finally, Employer argued that because Employee was aware of his possible lead toxicity as early as 2005, he knew or reasonably should have known he had a workers' compensation claim more than thirty days before he provided notice of an occupational disease to Employer, thereby making his notice legally insufficient.

Following an expedited hearing, the trial court ordered Employer to provide Employee a panel of hematologists, but declined to order the payment of temporary disability benefits. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2018). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v.*

3

*Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2018).

## Analysis

Employer presents three issues on appeal: (1) whether the trial court properly considered the expert opinions of Dr. Merrick; (2) whether Employee presented sufficient evidence to satisfy the notice requirement; and (3) whether Employee presented sufficient evidence to indicate he is likely to prevail at trial in proving an injury or occupational disease arising primarily out of the employment.

### *Consideration of Expert Medical Opinions*

Employer asserts the trial court erred in considering the expert opinions of Dr. Merrick with respect to alleged lead toxicity. It argues Dr. Merrick, who is board certified in cardiology and internal medicine, is not qualified to form an opinion as to the causal relationship between occupational exposures and Employee's medical conditions. We disagree. In *Luedtke v. Travelers Insurance Co.*, 100 S.W.3d 188 (Tenn. Workers' Comp. Panel 2000), the appellant made similar arguments to exclude expert testimony pursuant to Rule 703 of the Tennessee Rules of Evidence. In that case, the employee died of a heart attack, and one of the physicians who offered opinion testimony was a pain management specialist, not a cardiologist. *Id.* at 191. In rejecting the arguments for exclusion of this testimony, the Tennessee Supreme Court's Special Workers' Compensation Appeals Panel explained:

> Although Dr. Ensalada was not [the employee's] treating physician, Rule 703 cannot block his testimony. The fact that Dr. Ensalada is not the treating physician, and that his specialty is in pain management, and not in internal medicine or cardiology, goes to credibility and weight, not admissibility.

*Id.* (citations omitted). Thus, we conclude the trial court properly considered Dr. Merrick's testimony.

### *Notice of an Occupational Disease*

Employer also argues the trial court erred in rejecting its notice defense. When an employee seeks workers' compensation benefits for an occupational disease, the employee must establish that he or she gave legally sufficient notice to the employer "[w]ithin thirty (30) days after the first distinct manifestation of an occupational disease."

4

Tenn. Code Ann. § 50-6-305(a) (2018).  In interpreting this provision, which was not impacted by the 2013 reforms or subsequent amendments, the Appeals Panel has explained that "notice of an injury is tolled if an employee is reasonably unaware that the condition is work-related." *Clifton v. Nissan N. Am.*, No. M2008-01640-WC-R3-WC, 2009 Tenn. LEXIS 507, at *13-14 (Tenn. Workers' Comp. Panel Aug. 18, 2009). According to the Tennessee Supreme Court, "[i]t is enough that the employee notifies the employer of the facts concerning his injury of which he is aware or reasonably should be aware." *Pentecost v. Anchor Wire Corp.*, 695 S.W.2d 183, 185 (Tenn. 1985).

In *Mahle, Inc. v. Rouse*, No. E2005-02432-WC-R3-CV, 2006 Tenn. LEXIS 939 (Tenn. Workers' Comp. Panel Oct. 12, 2006), the employee alleged his long-term exposure to workplace chemicals caused various medical conditions that manifested in November 1998.  His attorney gave notice to the employer of his workers' compensation claim in April 2001, and the employer alleged the notice was legally insufficient.  *Id.* at *3.  In addressing the notice issue, the Appeals Panel explained that "notice can be excused or delayed if a reasonable excuse exists for not complying with the rule."  *Id.* at *9.  The Panel then noted that "[u]sually, the first manifestation is considered to occur when there is a diagnosis from a physician and the employee knows or should know that his problems are work-related."  *Id.*

In the present case, the medical records considered by the trial court revealed that Employee's physicians were concerned about lead exposure as early as 2005.  However, according to the records of Dr. Rolen and Dr. Lamb, there were reports of lead exposure at Employee's home as well as his work.  Although these records indicate Employee's physicians were suspicious of occupational lead poisoning, there is insufficient evidence that Employee was aware, or reasonably should have been aware, that his medical conditions constituted an occupational disease at that time.  For example, in his March 10, 2006 report, Dr. Lamb reviewed Employee's complaints of memory loss and stated, "I am wondering if this is correlated to his lead.  I do think it is so."  Dr. Lamb's testing revealed, however, that certain aspects of Employee's red blood cell structure were inconsistent with lead toxicity.  Such evidence falls short of showing Employee knew or should have known he suffered from an occupational disease in 2006.

In addition, when Employee saw Dr. Merrick in November 2016, ten years after the last treatment reflected in the record, he complained primarily of gastrointestinal symptoms, fatigue, and lower extremity pain.  Dr. Merrick noted his history of lead exposure and increased levels of lead in his blood, but none of Dr. Merrick's eighteen separate diagnoses indicated occupational lead toxicity at that time.  Employee testified that he discussed Dr. Merrick's concerns with the company owner, James Bready, but it is unclear when such conversations took place.  During the expedited hearing, the following exchange occurred between Employee and his counsel:

Q.      Did you at any time tell Mr. Bready of Doctor Merrick's diagnosis?

5

A. Yes.

Q. And was that during the time that you were still working at OG Kelley?

A. Yes.

Q. Okay. What did you tell him?

A. I told him that Dr. Merrick feels that this lead is what has contributed to me being sick, and that Doctor Merrick tried to refer me to someone that can help me . . . .

Employee further claimed he discussed with Mr. Bready Dr. Merrick's request that he be referred to a specialist and that, as a result of these discussions, he was allowed to see Dr. Famoyin. On June 16, 2017, Dr. Famoyin noted a "history of occupational exposure to lead, with possible toxicity."

During his testimony, Mr. Bready denied he ever discussed with Employee an alleged occupational disease. He testified that his receipt of a copy of Employee's February 2018 petition was the first notice he had of the claim for workers' compensation benefits. However, Mr. Bready admitted he was aware of Employee's treatment with Dr. Merrick and his request to see a different physician. The following exchange occurred during the expedited hearing between Mr. Bready and counsel for Employee:

Q. Was there a time when you gave [Employee] money, like $250 or $200 or some amount of money to go see different doctors?

A. One time. The only time, and the last time, which was in June because [Employee] was missing substantial time, he said he wanted to see a different physician. I assume that was Dr. Bishop. So he said he had to pay for it when he went, so I did give him money at that time. . . . And then he returned the money, and Dr. Bishop . . . called me back and said they told [Employee] that ["W]e're not taking him as a patient.["] . . .

Q. Did [Employee] have any conversation with you about why he was going to see Dr. Bishop?

A. He just asked for a blood test which I gave him. That's what I was paying for, a blood test. I was willing – more than willing to have any test, a blood test done.

6

Q.      Did you have any understanding as to why he thought he needed a blood test?

A.      No, he said that Dr. Merrick told him to do a check on that. . . . Now, [Employee] came in and said Dr. Merrick wanted to have him checked for the blood level to see where it was.

With respect to that blood test, Mr. Bready testified that "[i]t came within the parameters and I left it at that." The clear inference from this testimony is that Mr. Bready was aware at least in June 2017 that Employee was concerned about the level of lead in his blood caused by occupational exposures.

Although testimony from both Employee and Mr. Bready was somewhat muddled as to the precise timing and content of their conversations, or the timing of the blood test for which Employer paid, the evidence supports a conclusion that Employer had actual knowledge prior to Employee's last day of work that Employee was concerned about lead levels in his blood and wanted to see a specialist. Dr. Famoyin did not mention "occupational exposure to lead, with possible toxicity" until June 17, 2017, which was within 30 days of Employee's last day of work. Moreover, as noted by the trial court, Dr. Merrick did not opine Employee's occupational exposures were the primary cause of his medical condition until February 14, 2018, which was within six days of the date Employee filed his petition for benefits. Under these circumstances, we cannot conclude that the evidence preponderates against the trial court's determination that Employee is likely to prevail on the notice issue at trial.[2]

*Evidence of Medical Causation*

Lastly, Employer argues Employee presented insufficient evidence at the expedited hearing to support the trial court's determination he is likely to prevail at trial on the issue of medical causation. Specifically, Employer asserts that Dr. Merrick failed to consider all possible causes before offering his opinion that occupational exposure to lead contributed more than fifty percent in causing Employee's conditions.

As we have noted previously, while an injured worker retains the burden of proof at all stages of a workers' compensation claim, a trial court can grant relief at an expedited hearing if the court is satisfied that the employee has met the burden of

---

[2] Subsequent to the filing of its brief, Employer submitted a recent case, *Shores v. State*, No. M2018-00954-R3-WC, 2019 Tenn. LEXIS 24 (Tenn. Workers' Comp. Panel Feb. 12, 2019), in support of its position regarding notice. However, *Shores* is distinguishable from the present case in that the employee in that case alleged an acute event on a specific date that she claimed caused her mental injury. She did not allege an occupational disease caused by workplace exposures over a long period of time. Hence, we do not find the case determinative of the issue.

showing that he or she is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1). In making this determination, the trial court can consider both expert medical opinions and corroborative lay testimony. *See, e.g.*, *Thomas v. Zipp Express*, No. 2015-06-0546, 2016 TN Wrk. Comp. App. Bd. LEXIS 35, at *12-13 (Tenn. Workers' Comp. App. Bd. Aug. 2, 2016) ("While the medical records alone fall short of establishing compensability by a preponderance of the evidence, when such reports are considered in combination with Employee's testimony, . . . the evidence is sufficient to support the trial court's order for a panel of physicians.").

In the present case, it is unrefuted that Employee worked for over twenty years in a job that exposed him to lead. It is further undisputed that Employee has been diagnosed with elevated lead levels in his blood. He suffers from various medical conditions that have been causally related to lead exposure. Dr. Merrick has opined Employee's occupational lead exposure contributed more than fifty percent in causing Employee's medical conditions. Under such circumstances, we conclude the preponderance of the evidence supports the trial court's determination that Employee is likely to prevail at trial on the issue of medical causation, and we affirm the trial court's order for a panel of specialists.

## Conclusion

For the foregoing reasons, the trial court's order is affirmed and the case is remanded.



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Louis Wilson | ) Docket No. 2018-02-0115 |
| | ) |
| v. | ) State File No. 12598-2018 |
| | ) |
| O.G. Kelley and Company, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Brian K. Addington, Judge | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 15th day of March, 2019.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Daniel Bieger | | | | | X | dan@biegerlaw.com |
| Joseph Ballard | | | | | X | joseph.ballard@thehartford.com |
| Brian K. Addington, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | penny.patterson-shrum@tn.gov |

Jeanette Baird
Jeanette Baird
Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-0064
Electronic Mail: WCAppeals.Clerk@tn.gov